# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-1899

_____

United States of America

*Plaintiff - Appellee*

v.

Ellery Zephier, Sr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Southern

_____

Submitted: February 12, 2026
Filed: July 7, 2026

_____

Before LOKEN, LAVENSKI R. SMITH, and STRAS, Circuit Judges.

_____

LAVENSKI R. SMITH, Circuit Judge.

Ellery Zephier, Sr., was convicted of kidnapping and assault resulting in serious bodily injury. On appeal, he argues that (1) the district court[1] abused its discretion in admitting evidence of his kidnapping and assault of a former girlfriend under Federal Rule of Evidence 404(b) based on his claim that the former girlfriend

[1]The Honorable Roberto A. Lange, Chief Judge, United States District Court for the District of South Dakota.

had a motive to fabricate the incident; (2) the district court violated his Sixth Amendment right to confrontation by limiting his cross-examination of his former girlfriend; (3) insufficient evidence exists to support his kidnapping conviction; and (4) insufficient evidence exists to support his conviction for assault resulting in serious bodily injury. We affirm.

## I. *Background*

Zephier was charged with two counts of assault with a dangerous weapon, assault resulting in serious bodily injury, and kidnapping. The charges arose from Zephier's treatment of Kristy Selwyn, Zephier's ex-girlfriend, "[b]etween on or about July 20, 2024, and July 25, 2024." R. Doc. 28, at 1–2.

Prior to trial, the government filed a notice of intent to offer evidence pursuant to Federal Rule of Evidence 404(b). Specifically, it noticed, among other things, Zephier's 2022 arrest for simple assault domestic abuse of former romantic partner A.K. and his 2023 kidnapping and assault of former girlfriend Angelique Drapeau. The prior conduct involving A.K. concerned a report received by law enforcement that Zephier allegedly struck A.K. with a closed fist while he was driving. Regarding Drapeau, the notice summarized the evidence based on a January 2024 interview with Drapeau. She reported that during their relationship, Zephier held her against her will for approximately six hours in his camper. He scarred her face with a knife while she was there. Zephier also hit her when she attempted to leave the camper. The encounter ended when police arrived. The government argued Zephier's prior conduct involving Drapeau was admissible to show that he had the requisite intent to commit the assaults and kidnapping charged in the present case.

The government attached a summary of Drapeau's January 2024 interview to the notice. The summary states that Drapeau previously dated Zephier around the same time as A.K. Drapeau also told the FBI that she thought Zephier might have killed A.K. because he almost killed her when he restrained her in the camper. Drapeau had not spoken to Zephier since that incident because she was scared of him. Drapeau denied having anything to do with A.K.'s death.

Zephier filed a motion in limine, objecting to admission of the alleged 2023 assault of Drapeau. He argued that the evidence was highly prejudicial, he was never indicted, and Drapeau was not interviewed until about a year later. He also objected to the 2022 incident involving A.K.

At the pretrial hearing, the district court granted Zephier's motion to prohibit evidence of the 2022 incident involving A.K. But it "reserve[d] ruling on whether the [g]overnment ha[d] sufficient evidence to introduce the alleged [2023] assault on [Drapeau] under Rule 404(b)." R. Doc. 75, at 9. When Zephier's counsel indicated that he might have to file a supplemental motion in limine to prohibit Drapeau, who was not a witness to A.K.'s death, from testifying about her death, the court replied doing so was unnecessary because such testimony "would be plainly much more prejudicial than probative of anything, and it is speculative." R. Doc. 99, at 23. The court ruled that it would not permit Drapeau to speculate about A.K.'s death. The government then advised the court that it had not yet located Drapeau for purposes of testifying. Its plan was to establish Zephier's "conduct toward [Drapeau] through testimony of just Officer Edwin Young." R. Doc. 75, at 9. Officer Young was not the initial responding officer and never observed any assault. In light of the government's representations, the court held the issue of admission in abeyance.

At the end of the first day of trial, the government informed the court and counsel that it had located Drapeau and Officer John Sully, the initial responding officer from the 2023 incident. The court confirmed that it had left open the question of the admissibility of such evidence. The court noted that if Drapeau were available "to testify, bolstered by a responding officer who, at minimum, heard [what occurred] . . . then that certainly enhances the chances that that comes in." R. Doc. 101, at 136. In response, Zephier again objected to the evidence's admissibility. He argued that the initial call to law enforcement "wasn't a domestic violence call" but instead a call by Zephier's mother to remove Drapeau and Zephier from her property. *Id.* at 137. Zephier also pointed out that "the report taken by the FBI from [Drapeau] was a year after this event." *Id.* at 138. Despite Zephier's objections, the court

concluded that evidence concerning the 2023 incident was likely admissible. The court indicated that it would provide a limiting instruction concerning the evidence.

On the morning of the second day of trial, Zephier filed a supplemental motion in limine to prohibit Drapeau from testifying about the 2023 incident. Out of the jury's presence, the district court noted that Zephier's motion concerned "Drapeau's expression to law enforcement of a belief that . . . Zephier . . . had something to do with the death of [A.K.]," a "matter the [c]ourt ha[d] already ruled on." R. Doc. 101-2, at 5. Specifically, "[t]he court ha[d] ruled that any mention of A.K. or a belief that Mr. Zephier had anything to do with A.K.'s death or the incident where Mr. Zephier allegedly assaulted A.K. does not come in." *Id.* at 6. But the court pointed out that Zephier's supplemental motion took "a different tack and, somewhat curiously, concede[d] a similarity of the behavior of [Zephier] towards Angel[ique] Drapeau that's alleged to the behavior at issue here" with Selwyn. *Id.*

In response, Zephier argued that to properly cross-examine Drapeau, he would need to question her concerning Drapeau's rumored involvement in A.K.'s death influencing her motive to talk to law enforcement in 2024. The district court did not "quite buy the argument." *Id.* Zephier attempted to clarify his position. According to Zephier, in 2023, Drapeau told the responding officers, "I don't have anything to say, other than he wouldn't let me out of the trailer." *Id.* at 7. But after "being approached by people on the street who . . . accuse[d] her of [A.K.'s] murder," Drapeau spoke to the FBI in 2024 and asked for help relocating her out of the community. *Id.* at 8. Zephier reasoned that Drapeau had a strong motive to accuse Zephier of assault in 2024 given that she was "being confronted as the murderer" of A.K. *Id.* at 9. Zephier's concern was that Drapeau would "blurt[] out that Mr. Zephier was actually" A.K.'s murderer while he was "cross-examin[ing] [Drapeau] on a very valid bias that she m[ight] have." *Id.* at 10.

The court directed the government "to admonish [Drapeau] not to mention [A.K.] in her testimony or anything concerning a belief that [Zephier] had something

to do with [A.K.'s] death." *Id.* The court further ruled that "there should be no mention of [A.K.] whatsoever." *Id.* at 11.

Prior to Drapeau testifying, the court gave a limiting instruction:

> The [c]ourt anticipates that you are about to hear testimony about a previous act by the defendant against Angelique Drapeau. This testimony is going to be received for a limited purpose only. Testimony about any other assault may be used by you only to determine issues of the defendant's intent, absence of mistake, or lack of accident regarding the alleged behavior towards Kristy Selwyn in July of 2024. If you conclude that the defendant did not commit a prior assault on a different occasion, then you must disregard the evidence. The defendant, of course, is on trial only for the crimes charged, not for any other crime. You must not take testimony that he may have committed an assault on a prior occasion as evidence of the defendant's bad character trait or propensity to commit assaults.

*Id.* at 185–86.[2]

### A. *Drapeau's Rule 404(b) Testimony*

Drapeau testified that in May 2023, when she was in a romantic relationship with Zephier, she went to Zephier's trailer to retrieve some items that she had left. Zephier, who was drunk, became angry with Drapeau, told her to sit down, and would not let her leave. He called her names and struck her when she tried to stand. Zephier used his fist to hit Drapeau on the back of her head and her stomach. Zephier told Drapeau that she "wasn't going anywhere." *Id.* at 190. Once law enforcement arrived, Zephier "had [Drapeau] lay down, and he put [her] head . . . to his chest so it would muffle" her sounds. *Id.* Zephier ignored law enforcement's directive for him to open the door, so officers "forced their way in." *Id.* When law enforcement directed Zephier to come out, Drapeau testified, "[H]e let me go, and he told me he loved me, and he faced the cops." *Id.* at 191.

---

[2]The court also included a similar instruction in the final jury instructions.

On cross-examination, Drapeau testified that she did not call the police while she was in the trailer with Zephier. She also confirmed that she did not talk to the responding officers about what had happened. Drapeau agreed that the "first time" that she told an officer about the incident was in January 2024. *Id.* at 193. Drapeau further agreed that she asked law enforcement for help being "relocated" in that January 2024 interview. *Id.* Defense counsel asked Drapeau, "You had—you'd been approached by people in the community, and you felt like you wanted—based on them talking to you, you wanted to leave the community. Correct?" *Id.* at 194. Drapeau responded, "[y]es." *Id.* Defense counsel next asked Drapeau whether "people were accusing [her] of a crime in the community." *Id.* The government objected, and the court sustained the objection and struck the question from the record. Defense counsel then stated to Drapeau, "There were rumors about you in the community that were making you uncomfortable." *Id.* The government again objected. The court sustained the objection and asked to see counsel at sidebar. The following exchange occurred:

> THE COURT: [Defense counsel], I think if I allow those questions, it opens it up for the United States attorney to, on redirect, elicit the sole—why she was getting accused of the crime and what was going on. So I'm doing this somewhat protectively of you because I know you don't want to open the door to that. So that's why I've sustained those two objections. I've allowed the questions at this point, but I think you're treading right at the point of opening the door that you don't want to. So it's somewhat protective of your approach that the [c]ourt is doing this, if you understand.
>
> [Defense counsel]: I understand your ruling, Your Honor. I was trying to limit my questions in such a way to not do that, but I understand, and I won't pursue that further.

*Id.* at 194–95.

On redirect, Drapeau explained that she did not initially talk to law enforcement about the assault because she "didn't want [Zephier] to get in trouble." *Id.* at 196.

B. *Government Witnesses' Testimony*

In addition to Drapeau, the government presented the testimony of several witnesses to support the charged offenses. Selwyn, the victim, testified that she was in a romantic relationship with Zephier for approximately eight years. They had broken up approximately eight years prior to the charged incident. During their relationship, Zephier assaulted Selwyn on at least four occasions. *See* R. Doc. 101, at 43–49 (September 2016, January 2017, September 2020, December 2020). According to Selwyn, she reunited with Zephier and his sister at a party on Friday, July 19, 2024. After the party, Selwyn went to Zephier's trailer and stayed the night. On the morning of Saturday, July 20, 2024, Selwyn told Zephier that she "needed to go home." *Id.* at 16. Zephier responded in anger. He took her cell phone and broke it. He proceeded to physically assault her and confined her to the backroom of his trailer. He told Selwyn that she "wasn't going anywhere." *Id.* Selwyn "didn't feel free to leave." *Id.* at 17. She remained there out of fear.

Selwyn explained that on the morning of Sunday, July 21, 2024, she went with Zephier to the apartment that she shared with her mother to get some of her clothes. Zephier waited in the car while she retrieved her clothes. Selwyn remained in the apartment for 45 minutes. Out of fear of Zephier, Selwyn did not tell her mother about the incident the night before. After gathering her belongings, Selwyn returned to the car. Zephier then took Selwyn to pick up her paycheck. Throughout that day, Zephier controlled Selwyn's movements and stayed close by, causing Selwyn to feel "trapped." *Id.* at 19.

On the morning of Monday, July 22, 2024, after Selwyn spoke to her mother by phone, Zephier "allowed" Selwyn to return home to do laundry. *Id.* at 20. When she departed, however, Selwyn intentionally left some personal items behind. She testified that she left the items out of fear of Zephier; she "wanted him to feel like . . . [she] was going to come back." *Id.* She remained home until late Tuesday afternoon when she went back to Zephier's trailer. She returned because her personal items were there. She testified that she remained scared of Zephier. Selwyn recalled

going to Zephier's sister's home and drinking alcohol. When asked whether anything else occurred that evening, Selwyn recalled Zephier "beating [her] up." *Id.* at 21.

The next morning, Wednesday, July 24, 2024, Selwyn awoke to find Zephier passed out in a chair in the living room. She "was face down, all bloody, on [her] whole shirt all the way down to [her] pants." *Id.* at 22. Selwyn testified that she "even went to the bathroom on [herself] because of him stomping on [her] abdomen." *Id.* According to Selwyn, she "could barely move, barely breathe. [Her] eyes were almost completely shut. . . . [Her] mouth was cut open, [her] head was cut open in different spots. [Her] eyelid was cut open." *Id.* At approximately 7:00 a.m. Selwyn "crawled towards the door." *Id.* She then "took off running." *Id.* "[W]hen [she] looked back, [Zelphier] was right behind [her]." *Id.* Selwyn testified that he "grab[bed] [her] by [her] neck and drag[ged] [her] all the way back to that trailer by [her] neck." *Id.* Upon reaching the trailer, Selwyn testified, "[Zephier] flipped me on my back and kicked my teeth out. And then he grabbed me again and threw me in that trailer and then beat me up some more. And then he threw me in that trailer in that bed and started beating me up more." *Id.* Selwyn did not know if anyone saw them, she only guessed that "somebody should have seen" "but nobody—nobody heard [her]." *Id.* at 63. Upon their return to the trailer, Zephier "wouldn't let [Selwyn] leave." *Id.* at 23. She was unable to "even get out of that room." *Id.* Selwyn "kept slipping in and out of consciousness." *Id.* She advised Zephier that she "needed to go to the hospital," but he would not allow her to leave. *Id.*

That same day, Morman missionaries visited Zephier's trailer. Zephier ordered Selwyn "to shut the f**k up or he'll beat the f**k out of [her] if [she] made any noises." *Id.* at 34. He told her, "Be quiet and stay in that f***ing room." *Id.* Zephier sat outside with the Mormon missionaries for one hour. Meanwhile, Selwyn stayed inside the room as instructed because she was scared. She explained that she did not call out for help because she was afraid of "[g]etting hurt more or dying." *Id.* at 35. After the Morman missionaries left, Zephier returned to the room and helped Selwyn clean her face. Selwyn stayed again that night because she "had no choice" and "didn't feel free to leave." *Id.* at 36.

Late morning on Thursday, July 25, 2024, Zephier woke Selwyn to tell her that her mother was on the phone. *Id.* at 31. Her mother inquired why Selwyn was not answering her cell phone and had missed work; she also told Selwyn that her brother had been looking for her. Selwyn spoke with her mother but did not tell her what had occurred because she "was scared because [Zephier] was sitting right by [her]." *Id.* After the phone call, Zephier permitted Selwyn to take a shower and leave. Selwyn returned home but initially hid her face from her mother. Upon seeing Selwyn, her mother stated that she was going to call the police. Instead, Selwyn called her boyfriend to take her to the hospital. She did not call the police. At the hospital, Selwyn reported Zephier's abusive conduct to Officer Young.

On cross-examination, Selwyn admitted to seeing her brother while she was with Zephier. She explained she did not "call out to him" because he was some distance away and she "already knew he didn't like [Zephier]." *Id.* at 66. She did not run toward her brother because Zephier was "right beside [her]." *Id.* at 67. She believed Zephier would "just grab [her] and make [her] stay by him." *Id.* She did not want to create more problems. She explained that although her brother had been looking for her days prior, he "doesn't search for [Selwyn] if he knows where [she is] at." *Id.* at 66. Selwyn also admitted on cross-examination that she had a felony conviction for making a false statement to law enforcement.

Violet Provost, Selwyn's mother, testified that when Selwyn returned home on Thursday, July 25, 2024, she hid her face and went straight to the bathroom. Provost assumed that Selwyn must have called her boyfriend Jake while she was "in the bathroom because, you know, she has her cell phone." *Id.* at 130. Provost had heard Selwyn talking to someone while she was in the bathroom, but she admitted she did not know who it was. Provost confirmed that she did have a landline phone with the capability of being taken into the bathroom. When Selwyn exited the bathroom, Provost saw that Selwyn's "face was all bruised up, and her eye was almost closed." *Id.* at 128. Selwyn then told Provost that Zephier had "beat her up." *Id.*

Ashley Ruhaak, the nurse practitioner who treated Selwyn in the emergency room, testified that Selwyn's injuries were consistent with Selwyn's description of the beatings. She observed that Selwyn was missing a tooth and had bilateral black eyes, orbital swelling, abnormal lips with cuts and swelling, a nasal bone fracture, and fracture to her left medial orbital wall. Her examination of Selwyn also confirmed that Selwyn was tender to Ruhaak's touch in her stomach, neck, and back. Although Selwyn had no bruising on her neck, Selwyn "express[ed] tenderness to palpation." *Id.* at 122. Ruhaak testified that "[y]ou can still have an injury and not necessarily have physical findings that correlate to it." *Id.* Ruhaak testified that "[o]utwardly [Selwyn] appeared frightened." *Id.* at 77. Ruhaak documented that Selwyn "was crying. She was tearful, sad, verbalizing that she was in pain." *Id.*

Officer Young, who responded to the assault on Selwyn, testified that, during his interview with Selwyn at the hospital, "she had stated that . . . blood was outside the trailer and that [Zephier] had covered it up [with a rug]." R. Doc. 101-2, at 30. Officer Young went to the trailer; as he approached the rug, he observed "blood outside th[e] top of th[e] carpet." *Id.* at 30–31. Officer Young photographed the bloodstain. At trial, the government introduced the photograph into evidence. Officer Young testified that no one had called in to report an assault in the area where Zephier resided on Wednesday, July 24, 2024. Officer Young attempted to corroborate Selwyn's statements about the assault by speaking "to other residents that were present at the house on or around those days." *Id.* at 81. Selwyn had not disclosed any potential witnesses to Officer Young, and he was unable to find any. Officer Young was also unable to find any "cameras or Ring doorbells that . . . ha[d] a vantage point of the transit stop or th[e] area" where Selwyn reported the assault. *Id.*

FBI Special Agent Edmond Grant, who executed search warrants on Zephier's trailer concerning Selwyn's assault, testified that during his interview with Selwyn, she informed him that she had been wearing a "tan Snoop Dogg T-shirt" at the time of the assault. *Id.* at 49. When law enforcement executed the search warrant at Zephier's trailer, they recovered that shirt, along with gray sweatpants. Upon

inspection, Special Agent Grant surmised that the red substance covering the gray sweatpants was blood.

Krista Heeren-Graber, a licensed social worker and the Executive Director of the South Dakota Network Against Family Violence and Sexual Assault, testified that domestic abuse victims may have "an irrational belief that their abuser is omnipresent or omniscient." *Id.* at 166. According to Heeren-Graber, the victim may believe that the abuser is "always going to be there," that the victim is "never going to be able to get away from them," and that the abuser "will always be following [the victim]." *Id.*

After the government rested, Zephier moved for judgment of acquittal, arguing that the evidence was insufficient to prove the charges against him. The court denied the motion. Zephier called one witness and rested. The jury acquitted Zephier on both counts of assault with a dangerous weapon but convicted him of kidnapping and assault resulting in serious bodily injury.

## II. *Discussion*

On appeal, Zephier argues that (1) the district court abused its discretion in admitting evidence of his kidnapping and assault of Drapeau under Federal Rule of Evidence 404(b) based on his claim that Drapeau had a motive to fabricate the incident; (2) the district court violated his Sixth Amendment right to confrontation by limiting his cross-examination of Drapeau; (3) insufficient evidence exists to support his kidnapping conviction; and (4) insufficient evidence exists to support his conviction for assault resulting in serious bodily injury.

### A. *Federal Rule of Evidence 404(b)*

First, Zephier argues that the district court abused its discretion in admitting Drapeau's Rule 404(b) testimony about an alleged assault and kidnapping incident with Zephier in May 2023. In essence, he argues that Drapeau had ulterior motives that damaged her credibility, causing the evidence's probative value to be

-11-

substantially outweighed by unfair prejudice. As a result, he concludes that the court should have excluded Drapeau's testimony.

Federal Rule of Evidence 404(b) prohibits admission of a defendant's prior bad acts "to prove [the defendant's] character or propensity to engage in unlawful conduct." *United States v. Holt*, 160 F.4th 945, 948 (8th Cir. 2025) (citing Fed. R. Evid. 404(b)(1)). "But this evidence can be admissible for other purposes, such as proving motive, opportunity, intent, or knowledge." *Id.* (citing Fed. R. Evid. 404(b)(2)). Other acts evidence is admissible if the following four conditions are satisfied: "(1) it is relevant to a material issue; (2) it is similar in kind and not overly remote in time to the crime charged; (3) it is supported by sufficient evidence; and (4) its potential prejudice does not substantially outweigh its probative value." *Id.* (quoting *United States v. Gaddy*, 532 F.3d 783, 789 (8th Cir. 2008)).

This court reviews for an abuse of discretion the district court's admission of Rule 404(b) evidence. *Id.* "We will reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." *Id.* (quoting *United States v. Wilson*, 619 F.3d 787, 791–92 (8th Cir. 2010)).

Here, "Zephier acknowledge[s] that the incident with [Drapeau] was similar in kind and relevant to the offense charged." Appellant's Br. 25. Thus, the only disputed elements are whether the 2023 incident was supported by sufficient evidence and whether its potential prejudice substantially outweighed its probative value.

### 1. *Sufficiency of the Evidence*

According to Zephier, insufficient evidence supports Drapeau's allegations against Zephier. Zephier argues that Drapeau "had a strong motive to fabricate the allegations against Zephier as she wanted to relocate and to shift the spotlight off of her for A.K.'s death." *Id.* at 26. He maintains that her selfish concerns about community rumors linking her to A.K.'s death motivated her to speak to law

enforcement. He notes that she did not talk until eight months after the alleged 2023 incident with Zephier.

"[T]o be admissible under Rule 404(b), the district court need only determine that a reasonable jury could find by a preponderance of the evidence that the defendant committed the prior act. We have held that testimony from even a single witness is sufficient to support such a finding." *United States v. Brandon*, 64 F.4th 1009, 1022 (8th Cir. 2023) (citation modified). It is the province of the jury to determine witness credibility, "and we generally leave credibility determinations to the jury." *Id.* (citation modified).

Here, Drapeau's testimony alone was sufficient to support a finding of Zephier's prior abusive conduct in 2023. *See United States v. Johnson*, 860 F.3d 1133, 1143 (8th Cir. 2017) ("D.M.'s testimony by itself was sufficient evidence to support a finding that Johnson committed the conduct underlying his prior convictions."); *United States v. Johnson*, 439 F.3d 947, 953 (8th Cir. 2006) (finding a single witness's testimony regarding previous drug transactions between the witness and the defendant sufficient evidence to support the jury's finding that the defendant committed the prior acts of drug dealing). Drapeau testified that in May 2023, when she was in a romantic relationship with Zephier, she went to Zephier's trailer to retrieve some items that she had left. Zephier, who was drunk, became angry with Drapeau, told her to sit down, and would not let her leave. He called her names and struck her when she tried to stand. Zephier used his fist to hit Drapeau on the back of her head and her stomach. Zephier told Drapeau that she "wasn't going anywhere." R. Doc. 101-2, at 190. Drapeau "described officers being outside the trailer telling Zephier to open the door, his lack of compliance, and ultimately the officers forcing their way into the trailer." Appellee's Br. 19 (citing R. Doc. 101-2, at 190).

Although Drapeau's testimony by itself is sufficient to prove the 2023 incident, Officer Sully corroborated Drapeau's testimony. He testified that upon his approach to the trailer, he "could hear a female inside saying 'Please let go of me;

-13-

just let me leave,' and shuffling and noise." R. Doc. 101-2, at 199. Based on his "years of experience as a police officer dealing with domestics," Officer Sully surmised that "someone was being assaulted inside" the trailer. *Id.* According to Officer Sully, Zephier refused to open the door when requested, so the officers had to force entry into the trailer. After gaining entry, Officer Sully "observed [Drapeau] laying on the bed behind [Zephier]." *Id.* at 201. Zephier "had clenched fists and a tense facial expression." *Id.*

### 2. *Prejudice*

Zephier next contends that even if Drapeau's allegations were supported by sufficient evidence, her testimony would not be admissible if admitting it would unfairly prejudice Zephier.

"Admissible evidence is subject to [Federal] Rule [of Evidence] 403's unfair prejudice balancing test. The trial court should exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice." *United States v. Worthy*, 129 F.4th 479, 487 (8th Cir. 2025) (citation modified). "Unfair prejudice means an undue tendency to suggest decision on an improper basis." *United States v. Hayward*, 124 F.4th 1113, 1119 (8th Cir. 2025) (citation modified).

We hold that the potential prejudice of admitting Zephier's assault on Drapeau in May 2023 did not substantially outweigh its probative value. First, the evidence of the 2023 incident—which Zephier concedes was similar in kind and relevant to the offense charged—was highly probative of Zephier's intent to commit the charged offenses.

Second, as to prejudice, Zephier argues that he "was unfairly prejudiced by the admission of [Drapeau's] testimony because he could not effectively cross-examine her on the full scope of her motivation to fabricate the allegations against Zephier as the risk that [Drapeau] would accuse Zephier of murdering A.K. was too great." Appellant's Br. 26. He maintains that, although the district court excluded any mention of A.K.'s death as highly prejudicial, he "was entitled to a full cross-

examination of [Drapeau's] motivation to fabricate the allegations against him[,] which necessitated exploring the speculations surrounding A.K.'s death." *Id.* at 27. He asserts that the district court sustaining two of the government's objections to his questions about Drapeau wanting to relocate because people in the community were accusing her of a crime "undermined his efforts to limit the prejudicial effect of [Drapeau's] testimony" and prevented him from "defend[ing] against the Rule 404(b) evidence." *Id.* at 29.

We hold that Drapeau's testimony, while prejudicial, was not *unfairly* so. Zephier was able to cross-examine Drapeau on his claim that she had a motive to fabricate; specifically, he questioned her about initially declining to speak with officers about the 2023 assault, waiting until January 2024 to speak to law enforcement, and asking law enforcement during the 2024 interview for help relocating from the community. And although the district court did sustain the government's objections to Zephier questioning Drapeau specifically as to *why* she wanted to relocate, it did so "somewhat protectively" to prevent Zephier from "open[ing] the door to" the government eliciting on redirect "why [Drapeau] was getting accused of the crime and what was going on." R. Doc. 101-2, at 194–95. Moreover, the court gave the jury a limiting instruction prior to Drapeau's testimony. "We typically do not find that Rule 404(b) evidence was unfairly prejudicial when the district court gave an appropriate limiting instruction, instructing the jury not to use the evidence as proof of the acts charged in the indictment." *United States v. Womack*, 154 F.4th 584, 589 (8th Cir. 2025) (citation modified).

Accordingly, we hold that the district court did not abuse its discretion in admitting Drapeau's testimony and evidence about the 2023 incident.

## B. *Sixth Amendment Right to Confrontation*

Zephier next argues that the district court violated his Sixth Amendment right to confront the witnesses against him. He contends that the court's cross-examination limitation as to Drapeau prevented him from exposing her motivation to fabricate the 2023 assault allegations against him.

"We ordinarily review evidentiary rulings regarding the scope of a cross examination for abuse of discretion, but where the Confrontation Clause is implicated, we consider the matter de novo." *United States v. Maloney*, 102 F.4th 904, 912 (8th Cir. 2024) (citation modified). The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "Although the Sixth Amendment guarantees a defendant an opportunity for effective cross-examination of witnesses, that right is not unfettered." *Maloney*, 102 F.4th at 912–13 (citation modified). "The primary purpose of this right is to guarantee the opportunity for effective cross-examination, particularly with respect to a witness's potential bias." *United States v. Borders*, 829 F.3d 558, 566 (8th Cir. 2016) (citation modified). But the Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Maloney*, 102 F.4th at 913 (citation modified).

"To state a viable Confrontation Clause challenge to the district court's decision to limit cross-examination, the defendant must establish that a reasonable jury might have received a *significantly* different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination." *Id.* (citation modified). "A defendant establishes a violation of his confrontation clause rights by showing that he was prevented from exposing facts to the jury from which they could reasonably make inferences about the reliability of the witness." *United States v. Tetzlaff*, 175 F.4th 971, 980 (8th Cir. 2026) (citation modified).

"Here, the district court's limitations on [Zephier's] cross-examination of [Drapeau] did not prevent [Zephier] from exposing facts to the jury that would have allowed it to make inferences about [Drapeau's] credibility." *Id.* Drapeau's testimony related only to the Rule 404(b) evidence and was not substantive evidence supporting the charged offenses. Zephier effectively explored Drapeau's credibility by eliciting testimony from her that she did not speak to officers about the 2023 incident involving Zephier at the time of his arrest. Instead, she delayed talking to

law enforcement until January 2024. Through cross-examination, Zephier also showed that Drapeau spoke with law enforcement at that time seeking help being relocated. She also confirmed during cross-examination that she had "been approached by people in the community" and "wanted to leave the community" based on her conversations with them. R. Doc. 101-2, at 194. As explained *supra,* the district court limited questions concerning why others in the community were talking about Drapeau to "somewhat protectively" prevent Zephier from "open[ing] the door to" the government to elicit on redirect "why [Drapeau] was getting accused of the crime and what was going on." *Id.* at 194–95. "We conclude that these were reasonable limits on cross-examination that do not run afoul of the Confrontation Clause." *Tetzlaff*, 175 F.4th at 980 (citation modified).

## C. *Sufficiency of the Evidence*

Zephier also challenges the sufficiency of the evidence on his convictions. "We review the sufficiency of the evidence supporting a conviction de novo, 'viewing the evidence most favorably to the verdict, resolving conflicts in favor of the verdict, and giving it the benefit of all reasonable inferences.'" *United States v. Hensley*, 982 F.3d 1147, 1154 (8th Cir. 2020) (quoting *United States v. Riepe*, 858 F.3d 552, 558–59 (8th Cir. 2017)). We must uphold the verdict "if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *Id.* (citation modified).

### 1. *Kidnapping*

We first address Zephier's challenge to the proof supporting his kidnapping conviction. To prove the offense of federal kidnapping, the government had to prove the following four elements: "(1) the defendant unlawfully seized, confined, inveigled, decoyed, abducted, or carried away the victim; (2) *the defendant held the victim*; (3) the holding was for ransom or reward or otherwise; and (4) the defendant did so in a manner that created federal jurisdiction." *United States v. Blake*, 166 F.4th 611, 623 (6th Cir. 2026) (emphasis added) (citation modified); *see also United States v. Abdullahi*, 144 F.4th 1034, 1039 (8th Cir. 2025). Zephier's sufficiency argument focuses on whether the government produced sufficient evidence "that Selwyn was

being *held* by Zephier against her will." Appellant's Br. 24 (emphasis added); *see also* Appellant's Reply Br. 11 ("[N]o reasonable jury could have found that she was held against her will."). Zephier identifies two separate occasions when Selwyn left and returned to him: (1) Sunday, July 21, when she went with Zephier to pick up her paycheck and also to her mother's apartment to pick up personal items, and (2) Monday, July 22, when Selwyn returned to her mother's apartment, then went to work before returning to Zephier's trailer.

"The act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful *physical or mental restraint* for an *appreciable period* against the person's will and with a willful intent so to confine the victim." *Chatwin v. United States*, 326 U.S. 455, 460 (1946) (emphases added). "[H]olding someone for an 'appreciable period' requires more" than mere "seconds." *Abdullahi*, 144 F.4th at 1046 (Stras, J., concurring in part and concurring in the judgment) (quoting *Chatwin*, 326 U.S. at 460). "The holding element, in other words, . . . imposes a durational minimum." *Id.*

The holding element is not satisfied when the victim voluntarily chooses to remain with the defendant and is not held against her will. *Chatwin*, 326 U.S. at 459–60. However, the government may satisfy the holding element with evidence that the defendant "willfully intended through force, fear or deception to confine the [victim] against her desires." *Id.* at 460. The record evidence provided the jury with sufficient facts to enable it to conclude that Zephier held Selwin against her will by force and fear for substantial periods of time. Breaks in custody while remaining under threat do not foreclose the conclusion that she was held by Zephier. *Chatwin* "makes clear that the [holding] element . . . of federal kidnapping can encompass *intellectual or emotional force* of the type distinguished from . . . physical force." *United States v. Gillis*, 938 F.3d 1181, 1207 (11th Cir. 2019) (emphases added) (citation modified). We have previously upheld a defendant's kidnapping conviction based on evidence that although the victim initially consented to accompany the defendant, he later detained her despite her requests to be taken home. *United States v. Eagle Thunder*, 893 F.2d 950, 952 (8th Cir. 1990).

Zephier maintains that his case is analogous to *United States v. Chancey*, 715 F.2d 543 (11th Cir. 1983). In *Chancey*, "the defendant's conviction was overturned because the government failed to prove that the victim was transported involuntarily" by the defendant. *United States v. Wright*, 340 F.3d 724, 731 (8th Cir. 2003) (citing *Chancey*, 715 F.2d at 543). Zephier's reliance upon *Chancey* from our sister circuit is misplaced. Its "holding is limited to the rare case in which there is nothing but a witness's conflicted testimony to support the conviction." *United States v. Crenshaw*, 359 F.3d 977, 990 (8th Cir. 2004). That is not this case.

Zephier asserts that like the alleged victim in *Chancey*, "Selwyn had 'golden opportunities' to ask for help, she seemed to voluntarily spend several nights at Zephier's trailer, and the medical records did not support the various incidents of injuries she stated that he inflicted upon her." Appellant's Br. 39 (quoting *Chancey*, 715 F.2d at 547). Zephier maintains that "Selwyn's credibility was even more suspect than the alleged victim's credibility in *Chancey*" because she has a felony conviction for lying to law enforcement. *Id.* We, however, find *Chancey* distinguishable.

Unlike the alleged victim in *Chancey*, Selwyn's testimony that Zephier held her against her will for specific multi-day periods *was* corroborated. In addition to Selwyn's testimony, medical evidence and other witnesses' testimony support the finding that Zephier used physical *and* mental restraint to hold Selwyn against her will for an appreciable period of time. First, record evidence shows that Zephier used physical restraint to hold Selwyn. Selwyn testified that Zephier physically assaulted her on Saturday, July 20, 2024, after she asked to return home, and again on Wednesday, July 24, 2024, after he caught her attempting to escape. Medical evidence and corroborating testimony supported Selwyn's allegation that Zephier used physical force against her, in contrast to the alleged victim in *Chancey*, who "manifested no signs that force had been used against her." *United States v. Condon*, 162 F. App'x 657, 659 (8th Cir. 2006) (unpublished per curiam) (citing *Chancey*, 715 F.2d at 545). Specifically, Provost, Selwyn's mother, testified that Selwyn had facial bruising and a swollen eye when she returned home on Thursday, July 25,

2024. Ruhaak, the treating nurse practitioner, testified that Selwyn's injuries were consistent with Selwyn's description of the beatings. Ruhaak noted Selwyn's missing teeth, black eyes, facial swelling, facial fractures, and tenderness in her stomach, neck, and back. And the investigating officers located blood where Selwyn stated that the beatings had occurred and the bloodstained clothing that Selwyn reported wearing at the time of the assaults.

Second, the government presented evidence that Zephier also used mental restraint by keeping Selwyn in fear of her safety. Selwyn testified that on Sunday, July 21, 2024, Zephier took her to the apartment that she shared with her mother to retrieve clothing. Despite being alone with her mother in the apartment for 45 minutes, she did not tell her mother about Zephier's abuse the prior night because she was "scared" of him and did not want him to hurt her more. R. Doc. 101, at 18. She returned to Zephier, who was waiting for her in the car, because she was "scared" of him. *Id.* For the remainder of the day, Selwyn testified that Zephier "followed [her] everywhere" and did not allow her to get out of his sight. *Id.* Additionally, Selwyn testified that on Monday, July 22, 2024, she left personal items at Zephier's trailer despite him telling her that she could return to her apartment "because [she] was scared, and [she] wanted him to feel like . . . [she] was going to come back." *Id.* at 20. She explained that she returned to Zephier's trailer the following day because her personal items were there and that she remained scared of Zephier upon her return. She further testified that she did not seek help from the Mormon missionaries who visited Zephier's trailer on Wednesday, July 24, 2024, based on Zephier threatening to "beat the f**k out of [her] if [she] made any noises." *Id.* at 34. She was fearful that Zephier would hurt her more or kill her if she called out. The government presented evidence to corroborate Zephier's testimony about the mental restraint she felt that Zephier had over her. Specifically, Heeren-Graber, a licensed social worker, testified that domestic abuse violence victims may have "an irrational belief that their abuser is omnipresent or omniscient" and that the victim will never be able to escape from the abuser. R. Doc. 101-2, at 166.

We acknowledge that "some evidence at trial . . . tended to show that [Selwyn] *might* have enjoyed herself at some points during what she testified was her ordeal." *United States v. Hernandez-Orozco*, 151 F.3d 866, 870 (8th Cir. 1998) (emphasis added). But such evidence was not "so pervasive and so much in conflict with the rest of her testimony as to render incredible her account of the events." *Id.* We therefore uphold Zephier's kidnapping conviction.

### 2. *Assault Resulting in Serious Bodily Injury*

Zephier next challenges the sufficiency of the evidence for his assault conviction. "To establish an assault conviction . . . , the government was obligated to prove (1) an intentional assault that (2) results in serious bodily injury, committed (3) by an Indian and (4) within Indian Country." *United States v. Iron Hawk*, 612 F.3d 1031, 1036 (8th Cir. 2010) (citation modified). Zephier does not challenge that he is an Indian or that the alleged assault occurred within Indian Country. Additionally, "Zephier does not dispute that Selwyn was seriously injured"; instead, he argues only that "the evidence was insufficient to prove that Zephier assaulted Selwyn and caused those serious bodily injuries." Appellant's Br. 41–42. Zephier maintains that Selwyn's injuries resulted from her being "too intoxicated" and falling. *Id.* at 42 n.13.

We hold that sufficient evidence supports the jury's finding that Zephier assaulted Selwyn and caused her resulting injuries. At trial, Selwyn detailed a series of beatings by Zephier over the course of several days. She also testified about the resulting injuries that she sustained from the beatings that occurred on Tuesday, July 23, 2024, and Wednesday, July 24, 2024. Although Zephier challenges Selwyn's "general credibility" as "troublesome," Appellant's Br. 46, "[i]t is within the province of the jury to make credibility assessments and resolve conflicting testimony," *United States v. Chambers*, 133 F.4th 812, 816 (8th Cir. 2024) (citation modified). Furthermore, as indicated *supra*, the medical evidence corroborated Selwyn's testimony. Contrary to Zephier's claim, there is no record evidence to support a finding that Selwyn's injuries resulted from a drunken fall.

Viewing the evidence in the light most favorable to the verdict, a reasonable jury could find that Zephier assaulted Selwyn and caused her resulting injuries.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____